IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| AuSable Capital Partners, LLC, a Delaware limited liability company, | ) ) ) | Case No. _____ |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | |
| Sati Exports India Private Limited, a company formed under the laws of India, | ) ) ) | **COMPLAINT** |
| Samsara Surfaces LLC, a Georgia limited liability company, | ) ) ) | |
| Animesh Jaiswal, an individual, | ) ) | |
| Alok Jaiswal, an individual, and | ) ) | |
| Defendants. | ) ) | |

The Plaintiff, AuSable Capital Partners, LLC, by and through its undersigned counsel, files this Complaint against Defendants Sati Exports India Private Limited, Samsara Surfaces LLC, Alok Jaiswal and Animesh Jaiswal.

## PARTIES

1.      AuSable Capital Partners, LLC ("AuSable") is a company organized and existing under the laws of the State of Delaware. Matthew Galvez ("Galvez") is a resident of the State of Wyoming and is AuSable's Managing Member.

2.      Sati Exports India Private Limited ("Sati") is a company incorporated and organized in India, with a principal place of business in Bangalore, India.

3.      On information and belief, Sati uses the name "Sati" or "Sati U.S.A., LLC", although no entity has been organized.

4.      Sati regularly ships tile and hard surface into the United States, including into the State of Nebraska and specifically to Sunderland Tile and Stone ("Sunderland"), located in Omaha, Nebraska.

5.      Sunderland Tile and Stone is a seller of tile, stone and hard surfaces, and has maintained a location at 9700 J Street, Omaha, Douglas County, Nebraska, for years.

6.      Prior to June 2019, Sunderland was owned and operated by Sunderland Brothers Company, a now-dissolved corporation organized under the laws of the State of Nebraska. Sunderland Brothers Company was originally founded in 1883, and has continued to operate since such time selling tile, stone, coal, cement, and other building supplies in Omaha and the surrounding states.

7.      Samsara Surfaces LLC ("Samsara"), is a limited liability company organized and formed under the laws of the State of Georgia.

8.      In June 2019, Samsara purchased the assets of Sunderland and has operated the Sunderland business in Nebraska, Kansas, Iowa and Missouri thereafter.

9.      On information and belief, in October and November 2020 alone, Sati made eight (8) shipments of hard surface material to Sunderland in Omaha, Nebraska, and numerous more before and since.

10.     Animesh Jaiswal ("Jaiswal") is a resident of and domiciled in the State of Virginia.

11.     Jaiswal is the CEO of Samsara, and is a principal operator of Sunderland in Nebraska and routinely works at and operates the Omaha Sunderland location.

12.     At all relevant times, Jaiswal was also acting as an agent and representative of Sati.

13.     On information and belief, Alok Jaiswal ("Alok") is a resident of and domiciled in the State of Georgia.

14.     At all relevant times, Alok was an employee, officer or other agent for Defendant Samsara.

15.     At all relevant times, Alok was also acting as an agent and representative of Sati.


## JURISDICTION AND VENUE

16.     There is complete diversity of citizenship between AuSable, Samsara, Sati, Alok and Jaiswal and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Accordingly, this Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332.

17.     This Court has personal jurisdiction over Sati, Alok, Jaiswal and Samsara because each party is employed by Samsara, the Sunderland business and/or otherwise conducts business in and has adequate minimum contacts with the State of Nebraska.

18.     Venue is proper in the District of Nebraska.  A substantial part of the property that is the object of the litigation, the Sunderland tile and hard surface business, is located in this district. Therefore, venue is proper in the District of Nebraska pursuant to 28 U.S.C. §1391(b)(2).


## FACTUAL ALLEGATIONS/CAUSES OF ACTION

19.     In the early 2000s, Galvez was the President and CEO of Florida Tile Inc. ("Florida Tile"), one of the largest manufacturers and distributors of tile and stone in the United States.  At that time, Florida Tile owned and operated thirty-five (35) wholesale distributors of tile.

20.     Florida Tile conducted business with various wholesale distributors of tile across the country, one of which was Sunderland in Omaha; in fact, Florida Tile was one of Sunderland's largest tile suppliers from the early 2000s through 2019.

21.     Consequently, Galvez and John Sunderland, the former CEO of Sunderland,

became business acquaintances and have known each other since at least 2003. They maintained a professional relationship during the years that Florida Tile supplied Sunderland with products.

22. In 2005, Galvez acquired Elgin Butler Company, a glazed ceramic manufacturing firm in a related industry to Sunderland, and Galvez, for Elgin Butler Company, and John Sunderland engaged in a dialogue regarding a possible distribution agreement.

23. Throughout the years, Galvez and Mr. Sunderland have remained connected on various social media platforms, and had multiple discussions regarding the possible distribution by Sunderland of products manufactured by businesses affiliated with Galvez.

24. Additionally, Galvez and Mr. Sunderland remained connected for over the past seventeen (17) years personally, through the tile industry network, and through mutual friends.

## THE AUSABLE-SUNDERLAND TRANSACTION

25. In 2019, Galvez attended "Coverings 2019" in Orlando, Florida, a trade show for the worldwide tile and stone industry.

26. Prior to attending Coverings, Galvez became aware of the stressed financial condition of Sunderland, and was informed of the possibility to invest in Sunderland at the show.

27. Galvez contacted Mr. Sunderland to discuss the possibility of saving Sunderland from the threat of liquidation.

28. Galvez' suggested plan was to form a new entity that would be a strategic acquirer for Sunderland, and then to acquire and re-capitalize the business as part of this new entity (the "AuSable-Sunderland Transaction").

29. Galvez has experience in this type of arrangement, having purchased a large distressed tile distributor in a § 363 bankruptcy sale, which led to the rehabilitation and highly

profitable sale of such company for investors and management alike.

30. On or about May 6, 2019, after extensive research and negotiation between the parties, the AuSable-Sunderland Transaction commenced when the parties signed an exclusive agreement for AuSable to purchase the assets of Sunderland.

31. This AuSable-Sunderland Transaction was expressed by a Letter of Intent ("LOI") signed by Galvez and Mr. Sunderland.

32. The AuSable-Sunderland Transaction included the purchase of the company assets, and contemplated a continuing role for Mr. Sunderland, retention of employees and assumption of leases of Sunderland.

33. The majority of the purchase price for the AuSable-Sunderland Transaction would be allocated to preserving and maintaining the venerable (over 70 year-old) brand, the sales engendered by that brand, as well as supporting the exclusive distribution channel it represented.

34. AuSable proposed, structured and oversaw the AuSable-Sunderland Transaction, with representatives of AuSable traveling to Omaha to perform due diligence, obtain and review necessary documentation to substantiate the Transaction, and to negotiate with Sunderland's investment banker.

35. The AuSable-Sunderland Transaction was only possible because of the significant experience and skill of AuSable, as well as the personal connection of Galvez with Mr. Sunderland.

36. Contemporaneously with the negotiations and conduct of due diligence, AuSable began discussions with potential equity partners for the AuSable-Sunderland Transaction.

37. Based on its knowledge of prior transactions and suitability, AuSable specifically sought foreign investors seeking an enlarged distribution footprint in the United States.

38. AuSable believed this class of potential investors could benefit from both the

financial investment and from the increased distribution opportunities gained by participation in the ownership of the entity acquiring Sunderland's assets.

39.     On or about April 10, 2019, Galvez arranged an initial meeting in Florida between AuSable and representatives of Sati, and Galvez also traveled to Bangalore, India for a subsequent full-day meeting.

40.     Following extensive negotiations, AuSable and Sati agreed to proceed as equity partners in the AuSable-Sunderland Transaction, with final terms to be formalized during the ongoing due diligence period.

41.     As consideration for forming and finding the AuSable-Sunderland Transaction, AuSable would receive Thirty Four Percent (34%) ownership stake in the entity acquiring Sunderland's assets.

42.     As further consideration for AuSable, it would participate in the Board of the newly formed entity with at least one (1) Board seat, and it would be paid One Hundred Eighty Thousand Dollars ($180,000.00) for ongoing managerial consulting services after formation of the new acquiring entity.

43.     As consideration for providing the majority of the cash required at closing of the AuSable-Sunderland Transaction, Sati would receive the remaining ownership interest, an immediate controlling interest in the newly-formed company at closing.

44.     As further consideration, Sati could purchase AuSable's equity in the newly formed entity two years after closing the AuSable-Sunderland Transaction.


## SATI'S ADDITIONAL CONDITIONS

45.     The AuSable-Sunderland Transaction moved forward, with AuSable and Sati now

working together as future equity owners and Board members on the deal, until the beginning of June 2019.

46.     Up to and including this time, Galvez conveyed to Sati that Sunderland was a deeply distressed company, and characterized it on multiple occasions as a "melting ice cube."

47.     Consequently, the parties understood this salient point and recognized that "time was of the essence" to successfully maintain the customer base and keep the business open as part of the AuSable-Sunderland Transaction.

48.     As the motivating force for the deal, AuSable suggested strong, experienced candidates to serve on the executive team after the acquisition.

49.     AuSable generated and presented a draft business plan for the Sunderland-controlling entity.

50.     AuSable attempted to continue to move ahead expeditiously to halt the liquidation of Sunderland while the company still existed.

51.     While AuSable continued to move forward, it became aware of multiple issues with Sati.

52.     Although having actual knowledge of Sunderland's financial condition and that time was of the essence, Sati made no attempt to close the AuSable-Sunderland Transaction expeditiously.

53.     Instead, Sati intentionally delayed closing which risked liquidation and total devaluation of the Sunderland business and brand, thereby threatening to render the AuSable-Sunderland Transaction worthless.

54.     Further, rather than following the experienced advice of AuSable, Sati ignored or never read the business plan.

55.     Instead of using AuSable's suggested executive candidates or another experienced candidate, Sati nominated Defendant Jaiswal, on information and belief a representative and insider of Sati, to be the CEO of the newly formed entity with full authority starting at closing.

56.     Mr. Jaiswal had only briefly worked in the building products industry prior to his nomination and had no experience in management or even working in the private sector. Further, Defendant Jaiswal had no network of customers or suppliers in the business, nor in any hard surfaces or building products-related business beyond his 12 weeks as a Sati employee.

57.     On information and belief, Defendant Jaiswal was a close University friend of one of the Principals of Sati, and a motivating factor for the AuSable-Sunderland Transaction was to provide a new career path for Defendant Jaiswal.

58.     AuSable challenged Sati's recommendation of a "first-time" manager for a distressed and unfamiliar business.

59.     However, AuSable was informed that Defendant Jaiswal's employment as CEO was a new, additional condition to funding the AuSable-Sunderland Transaction at closing.

60.     Sati also insisted on structuring the AuSable-Sunderland Transaction in such a way that would require large amounts of equity rather than a more conventional combination of equity and subordinate debt.

61.     A combination of debt and equity would have enabled additional outside investors to participate at a lower cost. Sati's insistence on equity gave it a higher priority and protected its cash in the capital structure, while still allowing Sati to maintain control. This effectively shut out other investors from the AuSable-Sunderland Transaction because of the possible very high cost of entry.

62.      In addition to Sati's failure to move forward with haste, Defendant Jaiswal revealed

his inexperience by indicating, incorrectly, to key Sunderland employees that the AuSable-Sunderland Transaction had been finalized and signed before it actually occurred. His statements put both Sunderland and AuSable in a worse negotiating position.

## RE-TRADING STRATEGY

63.     Given the adverse interactions with Sati and the potential candidacy of Defendant Jaiswal to be CEO of Newco, AuSable concluded that the only way to save Sunderland, as well as AuSable's considerable investment up to that point, was to address the multiple issues that had arisen with the AuSable-Sunderland Transaction.

64.     On June 8-9, 2019, a lengthy and informed discussion and negotiation between Defendant Jaiswal and Alok (for Defendant Sati), Galvez and another representative of AuSable, occurred regarding the status of the AuSable-Sunderland Transaction.

65.     Defendants Jaiswal and Alok represented that Sati would pay AuSable for its considerable services used to obtain the AuSable-Sunderland Transaction.

66.     Based on the representations of Defendants Jaiswal and Alok, Sati agreed to pay AuSable as an accord for the AuSable-Sunderland Transaction.

67.     The accord included AuSable's agreement to accept Two Hundred Thousand Dollars ($200,000.00) at closing, rather than the equity in Sunderland and Board positions originally pledged as consideration.

68.     The accord was offered by Defendants Jaiswal and Alok, and its terms were expressly stated that in exchange for $200,000 to be paid to AuSable at closing, AuSable agreed to provide Sati the assignment of all of its rights to purchase Sunderland and to continue the use of its relationships to complete the contemplated transaction (the "Accord").

69.     The Accord was in exchange for the release of AuSable's interest in the exclusive right to purchase Sunderland expressed by the Letter of Intent executed by Galvez and Mr. Sunderland, AuSable's agreement to forgo its equity interest in the newly formed entity and any future upside in the sale of the equity of the business, release any claim to board position(s), and forgo any ongoing consulting fees.

70.     Pursuant to the Accord, AuSable exited the contemplated transaction pre-closing and agreed to assign all of AuSable's rights to purchase Sunderland pursuant to the LOI, and forgo the other benefits of the Transaction.

71.     On or about June 21, 2019, the designated acquiring company, Samsara, closed on the asset purchase of Sunderland.

72.     However, Defendants did not remit payment of the $200,000.00 to AuSable.

73.     To date, Defendants have not made any payment for AuSable.

74.     Almost immediately thereafter, Defendants informed AuSable that they intended to renegotiate the Accord, rather than honoring the negotiated buyout from the AuSable-Sunderland Transaction.

75.     These tactics are part of Defendants' strategy of "re-trading", which is getting a transaction under contract, then renegotiating the price after significant steps have been taken toward its consummation.

76.     AuSable has rejected the terms of any further "re-trading", renegotiations, additional accord or modification.

#### FIRST THEORY OF RECOVERY
#### BREACH OF CONTRACT/FAILURE TO SATISFY ACCORD ¥ SPECIFIC PERFORMANCE

77.     AuSable repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

78.     AuSable and Defendants agreed to certain terms regarding the respective obligations and rights under the AuSable-Sunderland Transaction, with each party giving and receiving consideration for said agreement.

79.     AuSable was to receive Thirty Four Percent (34%) ownership stake in the entity acquiring Sunderland's assets (which eventually was Defendant Samsara), a seat on the Board of the newly formed entity, as well as offer managerial and consulting services after formation of the newly-created company.

80.     Defendant Sati was to receive the remaining ownership interest (66%), controlling interest on the Board in the newly-formed company at closing and the right to purchase AuSable's equity two years after closing the AuSable-Sunderland Transaction.

81.     Rather than fulfilling the AuSable-Sunderland Transaction as contemplated, AuSable and Defendants entered into an Accord, offered by Defendants Jaiswal and Alok.

82.     The terms of such Accord as offered by Defendants and accepted by AuSable were simple: in exchange for $200,000 to be paid to AuSable at closing, AuSable agreed to release its claim to equity and a Board position, assign to Defendants its right to purchase Sunderland as memorialized in the LOI, and to use AuSable's relationship with Sunderland to complete the asset purchase.

83.     The terms of this Accord are consistent with the AuSable-Sunderland Transaction, and only provide a new mode of discharging the obligations of said deal.

84.     AuSable performed the Accord, and Defendant Samsara closed on the asset purchase of Sunderland.

85.     However, in breach of the Accord, Defendants failed to remit payment of the $200,000.00 to AuSable.

86.     Having breached the Accord by failing to satisfy its terms, AuSable is entitled to the terms and conditions of the original AuSable-Sunderland Transaction for Defendants' failure to satisfy the Accord.

WHEREFORE, AuSable requests the Court find that there was an enforceable contract between AuSable and Defendants regarding the asset purchase of Sunderland, to include the ownership and management of Samsara; that the parties entered into an Accord as provided above; that AuSable has satisfied all required conditions, but that Defendants failed to perform the Accord and/or otherwise failed to satisfy the terms of the parties' Accord; as a result of such failure to satisfy or perform the terms of the Accord, that AuSable is entitled to equitable specific performance of the terms of the original AuSable-Sunderland Transaction; that this Court should find that AuSable is the owner of Thirty-Four Percent (34%) of Samsara Surfaces LLC, and entitled to all right and benefits of such membership interest; find that AuSable, or its designee, is entitled to participate in the management of Samsara or any applicable management board; order Defendants to enter into the corporate records of Defendant Samsara that AuSable is the owner of such membership interest and that it is a Manager of Samsara, with all corporate authority granted to such Managers; and for such other relief as is just and proper.

**SECOND THEORY OF RECOVERY**
**BREACH OF CONTRACT ¥ MONETARY JUDGMENT**

87.     AuSable repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

88.     AuSable and Sati agreed to fund the AuSable-Sunderland Transaction, with each party receiving valuable consideration for the agreement.

89.     As an alternative to the foregoing Count I, the parties entered into a Novation of

the AuSable-Sunderland Transaction, in which Defendants would discharge their obligations thereunder by paying AuSable $200,000 at closing.

90.     AuSable was the efficient procuring cause for the transaction between Defendants and Sunderland.

91.     In fact, Pankaj Chaudhary, the founder, director and Board Member of Sati and member of the Board of Directors of Samsara, acknowledged that AuSable was entitled to compensation for its role in the AuSable-Sunderland transaction.

92.     Defendants breached the Agreement between AuSable and Defendants by failing to pay AuSable $200,000.

93.     Instead, Defendants refused to remit payment and have, instead, attempted to renegotiate the terms of the payment.

94.     As a result of Defendants' breach, AuSable has been damaged.

WHEREFORE, AuSable requests the Court find that there was an enforceable contract between AuSable and Defendants regarding the asset purchase of Sunderland, to include the joint ownership and management of Samsara; that the parties entered into a novation of such agreement, as provided above; that pursuant to such novation, Defendants were obligated to remit payment of $200,000.00 to AuSable in discharge of its other obligations under the AuSable-Sunderland Transaction; find that Defendants breached said novation, and that as a result, AuSable has been damaged in the amount of $200,000; that AuSable's damages are liquidated, and that prejudgment interest should commence as of June 21, 2019, the date of the asset purchase closing of Sunderland by Defendants; enter a judgment for post-judgment interest from the date of judgment herein; and for such other relief as is just and proper.

## THIRD THEORY OF RECOVERY
### JOINT VENTURE - BREACH OF FIDUCIARY DUTY

95.     AuSable repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

96.     AuSable and Sati entered into a joint venture to effectuate the AuSable-Sunderland Transaction, whereby AuSable provided experience, knowledge, and consulting services, and Sati provided the majority of the funding.

97.     As a result of the joint venture, AuSable and Sati agreed that AuSable would receive ownership in the newly formed joint venture company.

98.     As further consideration for AuSable, it would participate in the Board of the newly formed entity, and it would be paid $180,000.00 for ongoing managerial consulting services after formation of the new entity.

99.     As consideration for providing the majority of the cash required at closing of the AuSable-Sunderland Transaction, AuSable and Sati agreed that Sati would receive the remaining ownership interest, and Sati could purchase AuSable's equity in the newly formed entity two years after closing the AuSable-Sunderland Transaction.

100.    The parties had an expressed, or alternatively implied, agreement to engage in the business of acquiring Sunderland and operating as joint owners and managers.

101.    They shared a mutual interest in obtaining the profits and benefits of the Sunderland business through the AuSable-Sunderland Transaction and their joint efforts toward the asset acquisition.

102.    The parties had equal authority in such an endeavor, thereby constituting a joint venture between Sati and AuSable for the asset purchase of Sunderland.

103.    As parties to a joint venture, AuSable, Samsara and Sati had a fiduciary relationship

whereby each had fiduciary duties to each other, including a right to expect the utmost good faith and square dealing in all matters which relate to their common interest: effectuating the AuSable-Sunderland Transaction.

104.    The following acts and omissions constitute a breach of Samsara and Sati's fiduciary duties to AuSable:

        a.   Delaying the closing;

        b.   Structuring the ownership to discourage additional investors;

        c.   Insisting Jaiswal be the CEO of the new venture as a condition to funding;

        d.   Prematurely disclosing the existence of the agreement;

        e.   Failing to provide AuSable with thirty-four percent (34%) interest in Samsara, a management position and the post-closing consulting agreement;

        f.   Failing to pay AuSable $200,000 at closing;

        g.   Employing re-trading throughout the relationship of the parties; and

        h.   Such other acts or omissions to be established at trial or dispositive motion.

105.    AuSable has suffered damages as a result of these breaches.

WHEREFORE, AuSable requests the Court find that Sati and AuSable entered into a joint venture, the interest of which was to effectuate the AuSable-Sunderland Transaction and to jointly own and operate the resulting for-profit business; that as a result of that joint venture, Sati and AuSable had a fiduciary relationship and had fiduciary duties to each other; find that Sati breached its fiduciary duties by failing to act in good faith and fair dealing; find that as a result of such fiduciary breach, AuSable has been damaged in an amount no less than $200,000.00; find that AuSable's damages are liquidated, and that prejudgment interest should commence as of June 21,

2019, the date of the asset purchase closing of Sunderland by Defendants; enter a judgment for post-judgment interest from the date of judgment herein; and for such other relief as is just and proper.

## FOURTH THEORY OF RECOVERY
### FRAUDULENT MISREPRESENTATION

106.    AuSable repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

107.    As part of the AuSable-Sunderland Transaction, AuSable and Defendants agreed to terms regarding funding, co-ownership and management of Samsara.

108.    After entering into such agreement, Defendants rendered the contemplated transaction impossible by delaying the closing, structuring the ownership to discourage additional investors, and by insisting that an inexperienced individual should be the CEO of the new venture.

109.    As a result, on June 9, 2019, Defendants Jaiswal and Alok, as representatives of Sati, represented that AuSable would be paid Two Hundred Thousand Dollars ($200,000.00) at closing of the asset purchase, rather than AuSable receiving equity and managerial responsibility as originally intended.

110.    Alternatively or additionally, Defendants Jaiswal and Alok, as representatives of Samsara, represented that AuSable would be paid Two Hundred Thousand Dollars ($200,000.00) at closing of the asset purchase, rather than AuSable receiving equity and managerial responsibility as originally intended.

111.    This representation by Defendants Jaiswal and Alok, along with the other actions taken by Defendants, was part of an ongoing campaign of re-trading, which eventually led to removal of AuSable from the AuSable-Sunderland Transaction.

112. At the time Defendants made the representation regarding payment of the $200,000, they were aware that the representation was false, or made recklessly without knowledge of its truth and as a positive assertion, because of the re-trading strategy.

113. Almost immediately after closing, Defendants informed AuSable that they did not intend to remit payment of the $200,000 as represented.

114. Defendants made the representation with the intention that AuSable should rely on it, which it reasonably did, and as a result, AuSable suffered damage in (a) the lost benefit of the AuSable-Sunderland Transaction bargain, and (b) the pecuniary loss of the funds as a result.

115. Because Defendants Jaiswal and Alok committed fraud, they are not shielded from personal liability by the corporate or other business entity.

116. Because they were acting within their corporate capacity, Defendants Sati and/or Samsara should be vicariously liable for Defendants Jaiswal and Alok's misrepresentation, and AuSable's resulting damages.

WHEREFORE, AuSable requests the Court find that Defendants Jaiswal and Alok fraudulently induced AuSable into the Accord agreement through Defendant Jaiswal's misrepresentations; find that as a result, AuSable suffered damage in (a) the lost benefit of the AuSable-Sunderland Transaction bargain, and (b) the pecuniary loss of $200,000; based on such misrepresentation, permit AuSable to disaffirm the Accord, and to place it in the position it would have been "but for" Defendants' misrepresentation, *to wit*: ownership, management and other interests of the AuSable-Sunderland Transaction; alternatively, enter judgment against Defendants, jointly and severally, for damages incurred by such misrepresentations, in the amount of $200,000; find that AuSable's damages are liquidated, and that prejudgment interest should commence as of June 21, 2019, the date of the asset purchase closing of Sunderland by Defendants;

and for such other relief as is just and proper.

### FIFTH THEORY OF RECOVERY
### NEGLIGENT MISREPRESENTATION

117.    AuSable repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

118.    Defendants had a duty to supply truthful information to AuSable.

119.    On June 9, 2019, Defendants Jaiswal and Alok negligently misrepresented that Defendants would pay AuSable $200,000.

120.    At the time Defendants made the representation regarding payment of the $200,000, they failed to exercise reasonable care or competence in obtaining or communicating the information relating to Defendants' payment of this amount.

121.    Defendants made the representation with the intention that AuSable should rely on it, which it reasonably did, and as a result, AuSable suffered damage in (a) the lost benefit of the AuSable-Sunderland Transaction bargain, and (b) the pecuniary loss of $200,000.

WHEREFORE, AuSable requests the Court find that Defendants Jaiswal and Alok negligently misrepresented the payment of funds to AuSable; that such representation induced AuSable into the Accord agreement; find that as a result, AuSable suffered damage in the amount of $200,000; find that AuSable's damages are liquidated, and that prejudgment interest should commence as of June 21, 2019, the date of the asset purchase closing of Sunderland by Defendants; and for such other relief as is just and proper.

### SIXTH THEORY OF RECOVERY
### QUANTUM MERUIT

122.    AuSable repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

123.    In the absence of a contractual agreement between the parties, the Defendants benefitted from the origination, due diligence, information and assistance of AuSable in purchasing the assets of Sunderland.

124.    Justice, fairness and equity require Defendants to disgorge a benefit that they have unjustifiably obtained at the expense of AuSable.

WHEREFORE, in the absence of a contractual relationship between the parties, AuSable requests the Court find that Defendants were unjustly enriched by AuSable's actions and assistance in the Sunderland asset purchase; find that as a result, Defendants were enriched by AuSable in the amount to be determined at trial or other dispositive hearing, but in no event less than $200,000; find that AuSable's damages are liquidated, and that prejudgment interest should commence as of June 21, 2019, the date of the asset purchase closing of Sunderland by Defendants; and for such other relief as is just and proper.

DATED March 24, 2021

AUSABLE CAPITAL PARTNERS, LLC, Plaintiff

By:    _____

Rodney C. Dahlquist, Jr., #23912
Dornan, Troia, Howard, Breitkreutz & Conway PC, LLO
1403 Farnam Street, Suite 232
Omaha, NE 68102
(402) 884-7044
(402) 884-7045 fax
Rodney@dltlawyers.com
Attorney for Plaintiff